UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

BRANDON L. GEARHART, :
        :
   Plaintiff   :  No. 4:11-CV-00654
        :
  vs.     :  (Judge Kosik)
        :
MICHAEL J. ASTRUE,  :
COMMISSIONER OF SOCIAL :
SECURITY,     :
        :
   Defendant  :

**FILED
SCRANTON**

JUL 0 2 2012

PER _____
DEPUTY CLERK

MEMORANDUM

## Background

   The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Brandon L. Gearhart's claim for social security disability insurance benefits and supplemental security income benefits.

   On September 18, 2008, Gearhart protectively filed[1] an application for disability insurance benefits and an application for supplemental security income benefits. Tr. 13, 51, 53, 115, 118-128 and 130.[2]  On March 24, 2009, the Bureau of Disability

---

1. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

2. References to "Tr.__" are to pages of the administrative record filed by the Defendant as part of his Answer on June 14, 2011.

Determination[3] denied Gearhart's applications. Tr. 13 and 51-63.
On April 2, 2009, Gearhart requested a hearing before an
administrative law judge. Tr. 13 and 64.   After about 11 months
had passed, a hearing was held on March 4, 2010. Tr. 27-60.   On
June 22, 2010, the administrative law judge issued a decision
denying Gearhart's applications. Tr. 13-22.   On July 29, 2010,
Gearhart requested that the Appeals Council review the
administrative law judge's decision and on March 17, 2011, the
Appeals Council concluded that there was no basis upon which to
grant Gearhart's request for review. Tr. 1-3 and 8-9.   Thus, the
administrative law judge's decision stood as the final decision of
the Commissioner.

Gearhart then filed a complaint in this court on April
8, 2011.   Supporting and opposing briefs were submitted and the
appeal[4] became ripe for disposition on September 14, 2011, when
Gearhart filed a reply brief.

Disability insurance benefits are paid to an individual
if that individual is disabled and "insured," that is, the
individual has worked long enough and paid social security taxes.

---

3.   The Bureau of Disability Determination is an agency of the
Commonwealth of Pennsylvania which initially evaluates
applications for disability insurance benefits and supplemental
security income benefits on behalf of the Social Security
Administration.   Tr. 55 and 60.

4.   Under the Local Rules of Court "[a] civil action brought to
review a decision of the Social Security Administration denying a
claim for social security disability benefits" is "adjudicated as
an appeal."   M.D.Pa. Local Rule 83.40.1.

The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Gearhart met the insured status requirements of the Social Security Act through March 31, 2011. Tr. 13, 15 and 130.

Supplemental security income (SSI) is a federal income supplement program funded by general tax revenues (not social security taxes). It is designed to help aged, blind or other disabled individuals who have little or no income.

Gearhart, who was born in the United States on October 27, 1984,[5] graduated from high school in 2003 with a cumulative grade point average of 2.5251 out of 4.00. Tr. 47, 118, 125, 140, 149, 154, 160 and 168. Gearhart can read, write, speak and understand the English language and perform basic mathematical functions. Id. After high school Gearhart in July, 2007, obtained a Commercial Driver's License. Tr. 155.

Gearhart has a limited work and earnings history. He has past relevant work experience[6] as a dump truck driver and

---

5. At the time of the administrative hearing and the administrative law judge's decision, Gearhart was 25 years of age and considered a "younger individual" whose age would not seriously impact his ability to adjust to other work. 20 C.F.R. §§ 404.1563(c) and 416.963(c). The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

6. Past relevant employment in the present case means work performed by Gearhart during the 15 years prior to the date his
(continued...)

sandblaster. Tr. 46-47, 151 and 154. Gearhart also has work

experience as a ski-lift operator. _Id._  The ski-lift operator

position was described by a vocational expert as semiskilled,

light work, and the dump truck driver and sandblaster positions as

unskilled, medium work.[7] Tr. 46-47.

---

6.   (...continued)
claim for disability was adjudicated by the Commissioner.   20
C.F.R. §§ 404.1560 and 404.1565.

7.   The terms sedentary, light, medium and heavy work are defined
in the regulations of the Social Security Administration as
follows:

> (a) _Sedentary work_. Sedentary work involves lifting no
> more than 10 pounds at a time and occasionally lifting
> or carrying articles like docket files, ledgers, and
> small tools.  Although a sedentary job is defined as
> one which involves sitting, a certain amount of walking
> and standing is often necessary in carrying out job
> duties.  Jobs are sedentary if walking and standing are
> required occasionally and other sedentary criteria are
> met.

> (b) _Light work_.  Light work involves lifting no more
> than 20 pounds at a time with frequent lifting or
> carrying of objects weighing up to 10 pounds.  Even
> though the weight lifted may be very little, a job is
> in this category when it requires a good deal of
> walking or standing, or when it involves sitting most
> of the time with some pushing and pulling of arm or leg
> controls.  To be considered capable of performing a
> full or wide range of light work, you must have the
> ability to do substantially all of these activities.
> If someone can do light work, we determine that he or
> she can also do sedentary work, unless there are
> additional limiting factors such as loss of fine
> dexterity or inability to sit for long periods of time.

> (c) _Medium work_.  Medium work involves lifting no more
> than 50 pounds at a time with frequent lifting or
> carrying of objects weighing up to 25 pounds.  If
> someone can do medium work, we determine that he or she
> (continued...)

Records of the Social Security Administration reveal that Gearhart had earnings in the years 2000 through 2009 as follows:

| | |
|---|---|
| 2002 | $  436.95 |
| 2003 | 2269.10 |
| 2004 | 2735.92 |
| 2005 | 4989.27 |
| 2006 | 7496.08 |
| 2007 | 11474.13 |
| 2008 | 2588.24 |
| 2009 | 471.00 |

Tr. 129 and 131. Gearhart's total earnings from 2002 through 2009 were $32,460.69. Id.

Gearhart claims that he became disabled on March 15, 2008, because of morbid obesity, obstructive sleep apnea, lumbar degenerative disc disease, right knee degenerative joint disease, migraines, fatigue, high blood pressure, bipolar disorder and depression. Tr. 149; Doc. 12, Plaintiff's Brief, p. 1.  Gearhart

---

7.   (...continued)
     can do sedentary and light work.

     (d) *Heavy work*.  Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

20 C.F.R. §§ 404.1567 and 416.967.

has not worked since the 1st quarter of 2009.[8] Tr. 19 and 58. Tr.
129.

>For the reasons set forth below we will affirm the
decision of the Commissioner denying Gearhart's applications for
disability insurance benefits and supplemental security income
benefits.

**Standard of Review**

>When considering a social security appeal, we have
plenary review of all legal issues decided by the Commissioner.
See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d
Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181
F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d
857, 858 (3d Cir. 1995). However, our review of the
Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is
to determine whether those findings are supported by "substantial
evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir.
1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).
Factual findings which are supported by substantial evidence must
be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34,
38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported
by substantial evidence, we are bound by those findings, even if
we would have decided the factual inquiry differently."); Cotter

---

8.  As will be mentioned *infra* the administrative law judge
determined that Gearhart did not engage in substantial gainful
activity after March 15, 2008.

v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S.

7

474, 488 (1971). A single piece of evidence is not substantial

evidence if the Commissioner ignores countervailing evidence or

fails to resolve a conflict created by the evidence. <u>Mason</u>, 994

F.2d at 1064. The Commissioner must indicate which evidence was

accepted, which evidence was rejected, and the reasons for

rejecting certain evidence. <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642

F.2d at 706-707. Therefore, a court reviewing the decision of the

Commissioner must scrutinize the record as a whole. <u>Smith v.</u>

<u>Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981); <u>Dobrowolsky v.</u>

<u>Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

## Sequential Evaluation Process

To receive disability benefits, the plaintiff must

demonstrate an "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous

period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A).

Furthermore,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment
> or impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work experience,
> engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of
> whether such work exists in the immediate area in which
> he lives, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for
> work. For purposes of the preceding sentence (with
> respect to any individual), "work which exists in the
> national economy" means work which exists in significant

8

numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims.  See 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[9] (2) has an impairment that is severe or a combination of impairments that is severe,[10] (3) has

---

9.  If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit."  20 C.F.R. § 404.1510 and 20 C.F.R. § 416.910.

10.   The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id.  If a claimant has any severe impairments, the evaluation process continues.   20 C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process.   20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and 416.945(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b).  An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[11] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id.  As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[12]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1

---

11.  If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

12.  If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**Medical and Other Evidence**

The medical records reveal that Gearhart was treated for both physical and psychological problems.

Gearhart had right knee surgery in December, 2006. Tr. 207-208. At a follow-up appointment on January 31, 2007, less than two months before Gearhart's alleged disability onset date, it was noted that Gearhart had "done well post-operatively" and that he had "returned to all of his normal daily activities." Tr. 207. Gearhart had no "pain to speak of" and he was "able to ascend and descend stairs, one after another." Id. Gearhart used no assistive device for ambulation. Id. Gearhart was given a note to return to work. Id.

In June, 2008, Gearhart twisted his right ankle. Tr. 227. X-rays revealed no bony injury. Id. He was diagnosed with an acute right ankle sprain. Id.

On July 18, 2008, Gearhart visited the emergency department of the Chambersburg Hospital complaining of chills and headache. Tr. 225-226. The results of a physical examination were essentially normal other than slightly elevated blood pressure (147/90) and reflexes in the arms and legs were difficult to

11

elicit. Id.  It was noted that Gearhart had normal (5/5) motor

strength throughout. Id.  The report of this visit also states as

follows" "A CT scan was discussed with him for workup. However,

since he has no insurance, he would prefer not to incur the

expense. Since the original injury occurred a year ago [when he

struck his head in or about July 2007] and his present headache is

not different from what he has had previously, I do not feel that

I need to insist on the head CT." Id. The attending physician

concluded that Gearhart suffered from "acute cephalgia

[headache]." Id.

On September 11, 2008, Gearhart had a medical

appointment with W. David Kent, M.D., to "discuss disability" and

have disability forms completed. Tr. 276-277.  It was noted that

Gearhart was "not bothered by his legs or knees at the present

time." Id.  Other than elevated blood pressure and obvious morbid

obesity the results of a physical examination were essentially

normal. Id.  It was stated that Gearhart was not taking his blood

pressure medicine. Id.  Dr. Kent completed a Pennsylvania

Department of Public Welfare form in which he stated that Gearhart

was temporarily disabled for less than 12 months (from September

11, 2008, to January 1, 2009) because of morbid obesity, high

blood pressure and sleep apnea. Tr. 280.  Dr. Kent further noted

in the report of this appointment as follows: "Patient says he's

not working at the present time because no one will hire him because of his size." Tr. 276.

On September 15, 2008, Gearhart had an appointment regarding an abscess on the face. Tr. 275.   Gearhart was prescribed Doxycycline, an antibiotic. Id.   Other than the abscess it was noted that Gearhart appeared "healthy and in no distress." Id.

On or about September 29, 2008, Gearhart twisted his left ankle. Tr. 273.   X-rays revealed no fracture and he was diagnosed as suffering from a left ankle sprain. Id.

On November 6, 2008, Alex Siegel, Ph.D., a psychologist and consultant for the Bureau of Disability Determination completed a psychological evaluation of Gearhart. Tr. 252-264. Dr. Siegel concluded that Gearhart had no medically determinable mental impairment. Tr. 252.   Dr. Siegel's opinion was subsequently reviewed by Hillel Raclaw, Ph.D.. Tr. 324-326.   Dr. Raclaw agreed with Dr. Siegel's opinion. Tr. 324.

On November 11, 2008, Gearhart visited the emergency department of the Chambersburg Hospital complaining of chest pain. Tr. 349. Gearhart denied any other complaints. Id.   The chest pain was determined to be noncardiac in nature. Id. It was noted that he recently had an upper respiratory infection. Id.

At a medical appointment on November 12, 2008, Gearhart was diagnosed with acute bronchitis and he was prescribed an antibiotic. Tr. 269-271. Other than the respiratory problem, it was noted that Gearhart "appear[ed] healthy and in no distress." Tr. 270.

At a medical appointment on November 26, 2008, Gearhart complained of "back pain off and on" but it was noted that Gearhart was "able to ambulate without difficulty." Tr. 266-267. A physical examination was essentially normal other than some "mild tenderness overlying the left paraspinal musculature." Id. Gearhart denied "any numbness or tingling down into the lower extremities or radiculopathy." Tr. 266.

On December 13, 2008, Gearhart was examined by Seth Tuwiner, M.D., on behalf of the Bureau of Disability Determination. Tr. 294-301. Dr. Tuwiner concluded that Gearhart in an 8-hour workday could stand/walk approximately 5 hours, that he did not require an assistive device for ambulation, he had no limitations with sitting, and he could occasionally lift 50 pounds and frequently 20 pounds. Tr. 297. Dr. Tuwiner further found that Gearhart had "occasional postural limitations with bending, stooping, [and]  crouching" and "no manipulative limitations." Id.

An x-ray of the right knee on January 2, 2009, revealed no significant abnormalities. Tr. 301.

On February 20, 2009, Judy Kleppel, M.D., a medical consultant for the Bureau of Disability Determination concluded that Gearhart had the ability to stand/walk for 2-4 hours in an 8 hour workday, sit for 6 hours, occasionally lift/carry 10 pounds and frequently lift less than 10 pounds. Tr. 317-323.

On March 24, 2009, Gearhart visited the emergency department of the Chambersburg Hospital complaining of a right hand injury. Tr. 343-344. He alleged that he got his hand caught between two rocks and had "pain across the metacarpophalangeal joints of the right hand. Id. Gearhart had "[n]o other complaints or injuries." Id. An examination of the right hand revealed slight swelling. Id. An x-ray of the right hand was negative. Id.

On April 5, 2009, Gearhart visited the emergency department of the Chambersburg Hospital complaining of a left knee injury. Tr. 341-342. Gearhart alleged that he tripped and landed on his left knee. Id. X-rays of the left knee showed degenerative joint disease but no fracture. Id.[13]

On April 21, 2009, Gearhart had an appointment with Anthony Bruno, M.D., of Cumberland Valley Orthopaedic Associates. Tr. 332. The report of this appointment states in pertinent part as follows:

---

13. The number of visits Gearhart made to the emergency department and the types of injuries suggest that he was much more active than he alleged.

> This 24 year old gentleman well know to us at Cumberland Valley Orthopaedics having been taken to the OR in December 2006 for right knee arthroscopy and partial medial meniscectomy presents at this time with left knee complaints.  His difficulties began on the 20th of February when he felt a throbbing pain and his knee popped.  Since that time he has been getting along relatively well. He has been given medicines from Dr. Kent. He has mild discomfort at the extremes of motion. He is getting around relatively comfortably.  He explains that he has recently been turned down for Social Security Disability.  This is a closed, isolated injury with retained neurovascular status.  It is not radicular.
>
> *     *     *     *     *     *     *     *     *     *     *     *
>
> Exam shows a healthy appearing gentleman who is morbidly obese standing 6"4" and weighing 500 lbs. Incidentally he does described that Dr. Kent is referring him for the possibility of a lap band. Neck and back are basically benign without any compromise subjectively.  Both upper extremities are clinically normal.  The right lower extremity is normal. The left lower extremity has a normal hip, foot, and ankle.  The knee moves well. He has mild peripatellar pain. Quad function is fine. Joint lines are benign.  There is no effusion that can be appreciated.

Id.  Dr. Bruno's recommendation was that Gearhart "simply be observed" and seen in 3-4 weeks. Id.

On May 28, 2009, Gearhart had an appointment with Dr. Kent to evaluate his headaches. Tr. 375. The results of a physical examination were essentially normal. Id.  Gearhart's blood pressure was normal at 118/74. Id.  Dr. Kent prescribed the medications Toradol[14] and Topamax.[15] Tr. 376.

---

14.  Toradol (ketorolac) is a nonsteroidal anti-inflammatory
(continued...)

16

Gearhart visited the emergency department of the Chambersburg Hospital on June 4, 2009, complaining of a migraine headache. TR. 339-340. The results of a physical examination were essentially normal. Id. It was noted that Gearhart could ambulate without difficulty, he could perform rapid alternating movements without difficulty, and his coordination was intact. Id. Gearhart was diagnosed as suffering from acute cephalgia and obesity. Id.

On June 22, 2009, Gearhart had an appointment with Dr. Kent at which he stated that his headaches had "quieted down somewhat" and that he does not have continuous headache[s] for days on end" or blurred vision. Tr. 369-370. It was noted that an MRI scan of his brain "was essentially unremarkable" and that he did "not have any neurologic symptoms at the present time." Id.

Gearhart visited the emergency department of the Chambersburg Hospital on July 2, 2009, complaining of a nosebleed. Tr. 335. It was suspected that Gearhart suffered from sinusitis and he was prescribed an antibiotic. Id. Gearhart denied any headache or neck stiffness. Id. The results of a physical examination were essentially normal. Id.

---

14. (...continued)
drug. Toradol, Drugs.com, http://www.drugs.com/toradol.html (Last accessed June 21, 2012).

15. Topamax (topiramate) is a drug used to treat migraine headaches. Topamax, Drugs.com, http://www.drugs.com/topamax.html (Last accessed June 21, 2012).

On September 16, 2009, Gearhart visited the emergency department at the Chambersburg Hospital complaining of back pain. Tr. 333-334. Gearhart denied radiation of pain down his legs, numbness, tingling, bowel or bladder incontinence, trauma, fever or recent surgeries. Id. The results of a physical examination were essentially normal except for elevated blood pressure and soreness with palpation along the lower lumbar area. Id. Gearhart had a negative straight leg raise test, normal (5/5) motor strength, good sensation in all dermatomes[16] and normal reflexes in the lower extremities. Id. It also was observed that Gearhart "[a]mbulates without difficulty." Id. The attending physician's assessment was that Gearhart suffered from an "[a]cute exacerbation of chronic back pain." Id.

X-rays of the lumbosacral spine taken on September 18, 2009, revealed degenerative changes consistent with degenerative disk disease but no fracture or subluxation. Tr. 352.

On September 28, 2009, Gearhart had a sleep study at the Chambersburg Hospital which revealed that he suffered from

---

16. A dermatone is an area of the skin mainly supplied by a single spinal nerve, There are 8 such cervical nerves, 12 thoracic, 5 lumbar and 5 sacral. A problem with a particular nerve root should correspond with a sensory defect, muscle weakness, etc., at the appropriate dermatone. See Stephen Kishner, M.D., Dermatones Anatomy, Medscape Reference, http://emedicine.medscape.com/article/1878388-overview (Last accessed June 21, 2012).

obstructive sleep apnea but that CPAP[17] therapy was an effective modality in treating it. Tr. 351.[18]

In September, 2009, Gearhart commenced receiving counseling at Momentum Services, Chambersburg, Pennsylvania, from Kristine Steinour, a licensed professional counselor. Tr. 424. At the initial appointment on September 8, 2009, Gearhart indicated that he gets along well with his girlfriend and his girlfriend's son. Id. Gearhart told Ms. Steinour that he had a commercial driver's license and that he "enjoys haunted houses." Id. Gearhart's chief concern was "situational anger and depression, mood swings caused by housing problems." Id. Gearhart was also concerned about "verbal altercations with his stepfather" and the "potential" for those encounters to "escalate and be dangerous." Id. Several "interventions" were identified to help Gearhart deal with his anger and depression, including seeking alternative housing. Id. We do not discern the results of a detailed mental status examination at this initial appointment.

_____

17.  "CPAP" is an abbreviation for continuous positive air pressure.

18.  Gearhart called Dr. Kent's office on August 31, 2009, and stated that "he recently filed for disability through the [Social Security Administration]" and that he had lawyer who "asked him to call his DR." and "request[] that he have a sleep study, stress test, and be set up with a counselor to be treated and evaluated for depression." Tr. 361.

It appears that Gearhart had appointments with a psychiatrist or counselor at Momentum Services on September 18, November 12 and December 14 2009. Tr. 421-422.  The notes are in poor handwriting and we will not attempt to decipher them. Id.

On November 12, 2009, Gearhart had an MRI of the lumbar spine which revealed degenerative disk disease at the  L4-L5 and L5-S1 levels and a disk protrusion at L5-S1 minimally impinging on the S1 root. Tr. 391.

On January 11, 2010, a clinical treatment plan was prepared for Gearhart by Momentum Services. Tr. 416-419.  It was stated that Gearhart "has a strong close relationship with his fiancé, Sasha and son Dante" and that he "has been searching for alternative housing options." Tr. 416.  Gearhart's chief complaints were anger, depression, financial stressors, transportation and housing issues. Id.  Gearhart noted daily arguments "while residing with his mother." Id.  It was recommended as part of the treatment plan that Gearhart complete an application for public transportation and volunteer at an animal shelter to decrease his depression and anger. Tr. 419. We do not discern the results of a detailed mental status examination.

On February 2, 2010, Gearhart was sent by his attorney to Workwell Systems, Chambersburg Hospital for a functional

capacity evaluations. Tr. 392-402.  Gearhart was found capable of
medium work. Id.; Doc. 11, Plaintiff's Statement of Material
Facts, p. 23, ¶ 41.

On February 19, 2010, Ms. Steinour of Momentum Services
completed a mental impairment questionnaire.[19] Tr. 403-409.  It
was noted on the form that Gearhart suffers from an adjustment
disorder with anxiety. Tr. 403. After Ms. Steinour completed and
signed the form it appears that Peter Moskel, M.D., a
psychiatrist, also signed the form. Tr. 409.  The form indicates
that Gearhart was markedly and extremely limited in several areas
of mental functioning but also indicates that Gearhart's highest
Global Assessment of Functioning (GAF) score in the last year was
55 and that his current GAF score was 55.[20] Tr. 403 and 406-408.

---

19.  The questionnaire appears to have been submitted to Ms.
Steinour by Gearhart's counsel because it is not a standard form
of the Social Security Administration.

20.  The GAF score allows a clinician to indicate his judgment of
a person's overall psychological, social and occupational
functioning, in order to assess the person's mental health
illness.  *Diagnostic and Statistical Manual of Mental Disorders*
3-32 (4th ed. 1994). A GAF score is set within a particular range
if either the symptom severity or the level of functioning falls
within that range. Id. The score is useful in planning treatment
and predicting outcomes. Id.  A GAF score of 41-50 indicates
serious symptoms or any serious impairment in social,
occupational or school functioning.  Id.  A GAF score of 51 to 60
represents moderate symptoms or any moderate difficulty in
social, occupational, or school functioning. Id. A GAF score of
61 to 70 represents some mild symptoms or some difficulty in
social, occupational, or school functioning, but generally
(continued...)

21

Ms. Steinour and Dr. Moskel indicate that Gearhart "has lifting, walking, sitting, bending, leaning, standing, crouching limitations due to low back pain . . . and right knee pain" but do not specify the degree of limitation. Tr. 409. Ms. Steinour and Dr. Moskel indicate that Gearhart's "anxiety, depression, panic, anger started in 2002" and that his "back pain started in 2006 or 2007." Id. However, the form is vague as to whether the marked and extreme mental limitations assessed by Ms. Steinour and Dr. Moskel lasted for a continuous 12 month period.[21] The form further indicates that Gearhart was only moderately limited with respect to concentration, persistence or pace and despite all of the limitations identified by Ms. Steinour and Dr. Moskel, Gearhart had the ability to manage financial benefits. Id.

The record reveals that Gearhart was interviewed by A. Hawk, an employee of the Social Security Administration on September 25, 2008. Tr. 147-148. Interviewer Hawk reported that he observed that Gearhart had no problems in the following areas: hearing, reading, breathing, understanding, coherency,

---

20. (...continued)
functioning pretty well with some meaningful interpersonal relationships. Id.

21. The form only indicates that Gearhart's impairment – adjustment disorder with anxiety – lasted 12 months and commenced in 2002. Tr. 403-404. It does not indicate that the extreme and marked limitations allegedly resulting from that impairment lasted for a continuous 12 month period.

concentrating, talking, answering, sitting, standing, walking,
seeing, using hands and writing. Tr. 147. Hawk noted that Gearhart
"was very big, had visible tattoos on both arms and hands, and had
several piercings in his ears" and that Gearhart "[w]alked slowly
because of large size." Id. Gearhart testified that he is 6 feet
5 inches tall and weighs 532 pounds. Tr. 31. The medical records
reveal that Gearhart consistently weighed over 500 pounds.

In a document entitled "Function Report-Adult" Gearhart
stated he lives with his girlfriend and infant son. Tr. 165-172.
Gearhart cares for his son, including changing his son's diapers.
Tr. 166. Gearhart is able to take care of his own personal needs,
including dressing, bathing, hair care, shaving, and feeding
himself. Id. Gearhart needs no reminders to take care of personal
needs and grooming or to take his medications. Tr. 167.
Gearhart's girlfriend prepares his meals but he helps with washing
the dishes. Id. He needs no encouragement to do things. Id.
Gearhart drives a motor vehicle and is able to go out alone. Tr.
168. He is able to pay bills, count change, handle a savings
account and use a checkbook and money orders. Id. He likes to
read, watch TV, play video games and play with his son. Tr. 169.
Gearhart when given an opportunity to do so noted no problem with
reaching, sitting, talking, hearing, seeing, his memory,
concentrating, understanding, following instructions, using his

23

hands and getting along with others. Tr. 170.  Gearhart stated that he finishes what he starts and follows written instructions "well" but that spoken instructions "need to be repeated." Id.  He stated that he handles changes "ok" and has not noticed any "unusual behavior or fears." Tr. 171.  The record also reveals that Gearhart in September 2008 engaged in yard work (including cutting trees). Tr. 205. He also enjoys riding a 4-wheeler. Tr. 161.

Gearhart's mother completed a function report in which she stated that he "goes to his sister's house or friend's house to hang out and talk or play games." Id.  His mother noted that Gearhart for 3 to 4 years also has engaged in the program "Terror Behind Bars" every Friday and Saturday in the month of October. Tr. 161.  Gearhart's mother also stated that she has not noticed that he has "any unusual behavior or fears." Tr. 163.

Gearhart in a "Supplemental Function Questionnaire" stated that his fatigue began at the age of 16, that it was not associated with the onset of an illness and that the level of fatigue has remained the same since its onset. Tr. 173.  Gearhart also reported that he commenced having pain in his knees, ankles and joints in 2006 but that the pain is "not as bad as it was." Tr. 174.  Gearhart stated that he suffers from pain when he stands

24

or walks for long periods of time and during cold weather. Tr.
174.

**DISCUSSION**

   The administrative law judge at step one of the
sequential evaluation process found that Gearhart has not engaged
in substantial gainful work activity since March 15, 2008, the
alleged disability onset date. Tr. 15.  The administrative law
judge stated that Gearhart "worked after the alleged disability
onset date as a ski lift operator but on the average, this work
activity did not rise to the level of substantial gainful
activity." Id.

   At step two of the sequential evaluation process, the
administrative law judge found that Gearhart had the following
severe impairments: "morbid obesity, obstructive sleep apnea,
lumbar degenerative disc disease, bipolar disorder and right knee
degenerative joint disease." Id.  The administrative law judge
found that Gearhart's headaches and high blood pressure were non-
severe impairments. Tr. 15-16.

   At step three of the sequential evaluation process the
administrative law judge found that Gearhart's impairments did not
individually or in combination meet or equal a listed impairment.
Tr. 16-17.